## Case No. 11,104.

PHILLIPS v. M'CALL et al.

[4 Wash. C. C. 141.] [2]

Circuit Court, E. D. Pennsylvania. Oct. Term. 1821.

SALVAGE—WHAT IS SALVAGE SERVICE—CAPTURE —SHIPWRECK.

1. What is, and what is not a service, which will or will not entitle those who are engaged in it to salvage.

2. Effect of capture on the contract between the owners, and the master and crew of the captured vessel.

3. The duties of the master and crew in case of capture and shipwreck.

This is an appeal from a pro forma decree of the district court, which dismissed the libel of the appellant, surgeon on board the Mercury, for salvage.

The libel sets forth, that the ship sailed from Philadelphia to Calcutta in the year 1809, where she took in a valuable cargo, and on her return voyage, was, on the 8th of May, 1810, when near the island of Madagascar, captured as prize by a French national frigate. That all the officers of the Mercury, the master, the carpenter, the two supercargoes, and the libellant excepted, and the whole of the crew, with the exception of three ordinary seamen and one boy, were taken out of her, and were replaced by a prize master, two midshipmen and a crew of nineteen men, and she was ordered to proceed to the Isle of France for adjudication, under the Berlin and Milan decrees. Three attempts were made by the prisoners to retake the ship, in which the libellant took an active part. On the 21st of May, when about ten leagues from the Isle of France, the captors discovered a British frigate in chase of them, and fearing they would be overhauled, they determined to burn the prize, and to endeavour to reach the Isle of Bourbon, in their boats. The captain of the Mercury, the two supercargoes and the libellant, in as forcible a manner as possible, by declaring that at every risk they would resist an attempt to burn the ship, and by their resolution and interference, prevented the same from being executed. The near approach of the British frigate induced the prize master to propose to give up the ship to the master and the other persons, on condition that he, the master, the two supercargoes and the libellant, would execute an agreement in writing, binding themselves to reserve one half of the proceeds of the cargo for the captors, should the ship arrive in safety at any port. This offer was accepted, and the agreement having been executed as required, the prize-master and crew left the ship in the long boat. The libel then states the safe arrival of the ship at St. Helena, in fifty-four days after she was restored, after a tempestuous and dangerous navigation, rendered peculiarly laborious on account of the few hands left on board; the libellant performing, during the whole time, the duties of a seaman. Having obtained an addition to their crew at St. Helena, the ship proceeded on her voyage, and arrived in safety with her cargo at Philadelphia. The libel then states, that the libellant forbore to interpose a claim for salvage, after his arrival at Philadelphia, in consequence of assurances of aid and benefits given to him by many of the owners of the cargo. Early in the year 1811, the libellant went to Canton, and returned to the United States in the year 1815. The libel

[1] [Reported by Hon. William Cranch, Chief Judge.]

[2] [Originally published from the MSS. of Hon. Bushrod Washington, Associate Justice of the supreme court of the United States. under the supervision of Richard Peters, Jr., Esq.]

concludes with the usual prayer that the court will decree him a reasonable compensation, by way of salvage, for his services in assisting to save the ship and cargo.

The answer of the owners denies that any plan was concerted, or efforts made, to regain the possession of the ship from the captors, as charged in the libel; and that if any such was thought of, it was abandoned by its authors. The answer further states that the ship and cargo were voluntarily abandoned by the captors in consequence of the appearance of the British frigate; it admits the ransom of the ship and cargo, by the agreement stated in the libel, but denies that the libellant contributed, in any degree, to prevent the ship from being burnt by the captors, but that the same was effected by the persuasions of the supercargoes. The respondents allege, that from the arrival of the vessel at Philadelphia, for the space of more than five years, the libellant never asserted claim, or ever solicited any additional compensation for extraordinary services; and they deny that any assurances of aid and benefit were given to him by the owners, on account of such services; that a sum of money was bestowed by the owners and others concerned, upon the captain and crew, for their extraordinary services in navigating the vessel, and that a piece of plate was on the same account presented to the libellant and the supercargoes, and accepted by them, without the intimation, by either of them, of a wish to receive a pecuniary compensation. That an ample indemnity was given against the ransom bill, to the persons who executed the same, with which, and the recompense above mentioned, the libellants and the other persons on board have acquiesced, until the institution of this suit. That if a right of salvage ever did exist, it ought, after so great a length of time, after the absence and death of the witnesses, and the settlement of the concerns of the ship and cargo, to be considered as having been abandoned.

It was proved by the deposition of the captain of the Mercury, that the French captors took from the ship thirteen of her crew, including the officers (the witness excepted); and put on board nineteen men and three midshipmen from the prize ship, and ordered her for the Isle of France. That afterwards, upon the approach of the British frigate, the captors threatened to burn the prize, and to make off to the Isle of Bourbon, about three miles distant, in the long boat. The witness, the libellant, and the supercargoes, declared that they would remain by the ship, and be burned in her; that no other resistance was, or could have been made, as the prize crew were all on deck, so the prisoners dared not make any show of force. The only circumstance which induced the captors to give up the ship was the acquiescence of the witness, the supercargoes and the libellant (who remonstrated strongly against the threatened destruction of so valuable a cargo) in the offer made by the captors, that they should sign a ransom bill, agreeing to reserve for the captors one half of the cargo at any port where the cargo might be sold. As soon as this agreement was signed, the captors left the ship in the long boat. This witness speaks of the plans formed by himself, the libellant, and the supercargoes to retake the ship; but that they were discovered each time, and were unable to execute their designs. He further states that the force left on board for the navigation of the ship, at the time they were abandoned by the captors, consisted of four inexperienced coloured men, the carpenter and boy, exclusive of the witness, the libellant and the supercargoes, and two of the prize crew, who concealed themselves on board until after the captors had left them, one of whom was very serviceable; that they were exposed to violent storms on the voyage to St. Helena, and to great and incessant labour and fatigue. In respect to the particular services rendered by the libellant, the witness states that he could not, and did not stir about, never went aloft but for his own amusement, and did no duty of any sort, except to hold the glass, and now and then to jog at the pump, and that seldom. Sometimes he helped to pull the ropes on deck, but not often, though he generally did it when he was asked; all the severe duty fell on the witness and crew, the supercargoes and libellant doing comparatively nothing, except that Mr. Bispham sometimes steered.

It was further proved that after the libellant left the United States for Canton in July, 1811, the underwriters sent to his mother's house, where he had resided, a piece of silver plate as a compliment, with an inscription commemorative of his services in assisting to rescue the Mercury and her cargo from the French captors, and in the subsequent navigation of the ship.

C. J. Ingersoll, for appellant.
Binney & Sergeant, for appellee.

WASHINGTON, Circuit Justice. The advocates for the appellant have relied upon two grounds, on one or both of which, they have endeavoured to maintain the claim for salvage. The first is the management and address by which the possession of the vessel and cargo was obtained from the captors; the second, the labor and peril encountered by the libellant in her subsequent navigation to Philadelphia.

1. The address practised for the purpose of recovering possession of the ship was, as the captain has related the transaction, almost entirely of a negative character; for he swears, that the only circumstance which induced the captors to restore the ship was the acquiescence of himself, the two supercargoes, and the libellant, in the offer made by the captors that they should sign a ransom bill, agreeing to reserve for the captors one half of the cargo at any port where it

might be sold; and as soon as this agreement was signed, the captors left the ship in the long boat. It is true they remonstrated against the threatened destruction of so valuable a cargo, and even went so far as to declare the desperate resolution of remaining on board, and participating in the fate of the ship. Whether the captors placed much confidence in the sincerity which dictated this heroic threat of self devotion, or cared very much whether it were carried into execution or not, is more than I can say. But one thing is perfectly clear, that if they felt a wish to prevent it, it was entirely in their power to do so, as the captain swears that no other resistance was, or could have been made, as the prize crew were all on deck, and the prisoners dared not to make any show of force. I strongly suspect, therefore, that the captors were as little influenced in their conduct by the threat, as they were by the remonstrances of those persons, and that, looking exclusively to their own interest, they thought it would be better to secure one half of the cargo, than to hazard the loss of the whole by a re-capture. I pass over the plans which were formed by these persons to retake the ship, with this observation, that as they were not successful, and indeed they were not even evidenced by any overt act, they had no other merit than that of good intentions. The only question then is, whether the signing of the ransom bill can be considered as a salvage service performed by any of the parties to it? That the owners derived a benefit from the act, may readily be admitted; but where is the merit which can entitle the signers of that instrument to a reward? They recovered their liberty, preserved the half of their own property on board, and had possession of the ship and cargo for their complete indemnification. Tranter v. Watson, 2 Ld. Raym. 931; Yates v. Hall, 1 Term R. 73. The ransom bill does not oblige them to pay a gross sum, which by any accident might exceed the value of the cargo; but merely stipulates that the proceeds of one half of the cargo should be reserved for the captors, in case of safe arrival at some port in the United States.

The argument most relied upon by the libellant's counsel was, that the capture put an end to the contract between the owners, and the officers and crew of the vessel; and, consequently, that their subsequent acts to save the property were merely voluntary, and not enforced by any duty which bound them to the owners. I admit the effect of a capture to be, to a certain extent, such as is contended for; but I cannot as easily yield my assent to the conclusion which the counsel would draw from this admission. Wiggins v. Ingleton, 2 Ld. Raym. 1211. It is strictly true, that capture, so long as it continues, puts an end to the claim for wages; but if the ship be recaptured, and performs the voyage, by which she earns freight, the right to full wages is revived. So, if the vessel be taken in by the original captors for adjudication, the master and crew cannot, without a breach of duty, abandon the ship to her fate. The master, in particular, although his duties, as such, ceased by the capture, continues, by intendment of law arising out of the necessity of the case, the agent of the owners, and in that character duties are imposed upon him which he is not at liberty to decline; and although his claim to wages is defeated, he is nevertheless entitled to a reasonable compensation for his services as agent, even although the vessel should be condemned. Abb. Shipp. 285; Bergstrom v. Mills, 3 Esp. 36; Smith v. Gilbert, 4 Day, 105. As to the seamen, it has been decided by the judge of this district, that they are bound to await the sentence of the court in the first instance, and if the ship be acquitted, to rejoin her, in which case they will be entitled to full wages upon the termination of the voyage. The Elizabeth [Case No. 1,657]. If, instead of a recapture or acquittal, the vessel is ransomed, the owner is considered as a purchaser, and the right to antecedent wages is gone. Wiggins v. Ingleton, 2 Ld. Raym. 1211; Yates v. Hall, 1 Durn. & E. [1 Term R.] 79.

In like manner shipwreck puts an end to the contract between the owners, and the master and crew, so far as it concerns their claim to wages; and yet the latter cannot, without a breach of duty, abandon the property, as if they were entire strangers to the owner, and aliens to his interest. On the contrary, it is the duty of the master, to whose care the safety of the ship and cargo were confided, to employ all his courage, skill, and industry in their protection and preservation; and of the seamen, to use their best endeavours to save what they can of the merchandize; and, in proportion to their success, they will be entitled to wages out of what is saved, or to a reasonable compensation for their labour and exertions to save the property. Abb. Shipp. 277; 2 Marsh. Ins. 527. But I can find no authority in support of a dictum by Abbot (Shipp. 278) that the seamen are entitled, as well as other persons, to a compensation by way of salvage. By the Laws of Oleron, the master is bound to allow them a reasonable consideration for preserving a part of the cargo, so as to enable them to return to their own country; and it is pretty clear, that the allowance made to the seamen by the different ancient ordinances, is not as salvage, but as a reasonable compensation for their labour and exertion in saving the whole or part of the cargo, or as wages for their past services.

Upon the whole, it would seem, that, although the contract between the owner, and the master and crew is put an end to by capture or shipwreck, in respect to wages, the latter are not discharged from certain obligations in respect to the safety of the property. If the master, acting for the bene-

fit of his owner, can regain possession of the ship by a ransom, or by a purchase after capture and condemnation, he has full authority to do so, and, in the exercise of such authority, he is strictly within the line of his duty. If, by such acts, or by personal labour in case of shipwreck, the master and crew render a service to the owner, it is not a meritorious service; their conduct on such occasions being such, and such only, as the owner had a right to expect from them.

As to the physician or surgeon, although he is not, strictly speaking, an officer or seaman, he is a member of the family, placed on board by the owner, engaged in the service of the ship, and bound by contract to perform certain duties; and although he might not have violated any positive obligation which the nature of his employment imposed upon him, by refusing to sign the ransom bill, his signing it was, nevertheless, an act which the owners had a right to expect from him, particularly as he assumed thereby no possible risk, either to his person or property. If such an act could possibly be exalted into a salvage service, it is much to be wondered at that this is the first attempt which has been made to obtain a reward for having rendered it. We find cases of suits brought upon ransom bills, and by hostages, to compel the owner to discharge them, or to enforce agreements made with them by the master, to induce them to become hostages; but I have met with no case, where even an hostage, who had suffered a long confinement, in consequence of the ransom, and of a voluntary act of his own, has set up a claim for a reward, beyond what may have been promised him by the master. If the libellant is not entitled to salvage, on account of his conduct, up to the time when the ship and cargo were ransomed and restored to the master; the second inquiry will be, is he so entitled because of the assistance which he afterwards afforded in navigating the ship to the United States?

Whatever may have been the legal effect of the capture, while it continued, upon the contract between the owners, and the officers and crew of the vessel, it must be admitted, that all their rights and duties revived after she was restored; and I hold it to be quite immaterial to the present question, whether the old contract was revived, or whether the officers and crew were to be considered as impliedly entering into a new contract with the owners, to complete the voyage to the United States. In the case of The Harmony [Case No. 2,871], the learned judge of the district court decided, that the contract with the master and crew was merely suspended by the capture.

Mr. Buller, in the case of Yates v. Hall, 1 Durn. & E. [1 Term R.] 79, states the rule of law to be, that by capture, the wages are lost; and he considers the ransom as a new purchase of the vessel and cargo, the consequence of which would be, that the claim to subsequent wages would rest upon an implied new contract for the residue of the voyage. But however this may be, it seems quite clear, that the relation of the master and crew to the ship, and their duties, are precisely the same as they were previous to the capture. No extremity of labour or of peril in the navigation of the ship, can entitle them to a reward beyond their wages, because the nature of the service in which they engage exposes them to extraordinary peril and labour, in particular emergencies; and they contract to encounter them in consideration of the wages stipulated to be paid them. They have, therefore, no merit in making such exertions, because they do no more than what their duty requires of them; besides which, as their wages depend upon the arrival of the vessel, and her earning freight, they have an interest in making them. If the vessel should be attacked by pirates, or by an enemy, by means of which, or of some pestilential disorder, two-thirds of the crew should be swept away, it surely could not be contended that the increased peril and labour to which the survivors would thereby be exposed in navigating the vessel, would entitle them to an extra reward, in the nature of salvage.

I am aware of no case, in which such a claim has been upheld. Salvage, in the case of rescue, proceeds upon the ground before mentioned, that the contract was put an end to by the capture; and consequently the service rendered, besides being voluntary, and ultra the duty which the rescuers owed to the owners, is one of very extraordinary merit, in which human life was jeoparded. In the case of Mason v. The Blaireau, 2 Cranch [6 U. S.] 240, Tool, one of the crew of the vessel saved, was allowed salvage, upon the ground that he was discharged from his contract as a seaman, by the abandonment of the vessel by the master and the rest of the crew; and consequently, "those principles of policy," to use the language of the chief justice, "which deny to the mariners of the ship salvage for saving the ship, however great the peril may be, do not apply to this mariner." In Newman v. Walters, 3 Bos. & P. 612, the passenger was allowed salvage, because, by assuming the responsibility, and performing the duties of the master, he went beyond what his duty required of him; and Lord Alvanley observes, that if the mate had performed the same service, he would not have been entitled to salvage. The claim of a pilot to salvage, for safely conducting the ship into port, is placed by Sir William Scott (The Joseph Harvey, 1 C. Rob. Adm. 307), and by Lord Alvanley (Newman v. Walters), upon the same ground, namely, services performed beyond what his duty as pilot required of him.

It was insisted in this case, that the libellant was not bound to perform the duties of a seaman, being employed exclusively for another purpose. But I conceive that what

Lord Alvanley says, in respect to the duty of a passenger, who is bound by no contract to remain with the ship, but may leave her whenever he pleases, applies, a fortiori, to the libellant, who was so bound, and who could not, without a breach of his contract, have abandoned the ship. The observation alluded to is, "that a passenger who is found on board in time of danger, is bound to do works of necessity, for the preservation of the lives of all on board." Now in this case, the services of the libellant were necessary for the common safety; or they were not. In the first case, it was his duty to render them, and he must seek his reward in the conviction that he faithfully discharged that duty. In the other branch of the alternative, he rendered no beneficial service for which he ought to be rewarded. But if it were necessary to estimate the quantum of service performed by the libellant, which, for the above reasons it is not, he would be found to be totally destitute of merit. It appears from Captain O'Connor's testimony, that his services rather fell short, than exceeded what he had the ability to render; and which, therefore, his duty required him to render.' My opinion being that the libellant never had a well founded claim to salvage; there is no need to decide, whether it was abandoned by his acceptance of the piece of plate, and his forbearing for so many years to prefer his claim. I shall affirm the decree of the district court with costs.